## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BRADLEY J. PIERSALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3172 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michael Bradley J. Piersall appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Piersall filed a Motion for Summary Judgment (d/e 13). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 22, 2017 (d/e 8). For the reasons set forth below, the decision of the Commissioner is REVERSED and REMANDED.

<u>STATEMENT OF FACTS</u>

Piersall was born on May 9, 1980. Piersall did not complete high school and did not secure a GED. Piersall previously worked as retail sales attendant, cable helper, construction worker, and machinist helper. He has not worked since September 1, 2011 (Onset Date). Piersall suffers from disorders of the spine. <u>Certified Transcript of Proceedings Before the Social Security Administration (d/e 11) (R.)</u>, 11, 13, 19-20, 97.

On September 5, 2011, Piersall had an MRI of his cervical spine without contrast. The MRI showed multilevel disk disease and degeneration, most notably at C6-7. The MRI showed moderate disk herniation contacting and deforming the cord producing moderate left-sided neuroforaminal encroachment. R. 471.

On October 18, 2011, Piersall had imaging of his lumbar spine without contrast. The imaging showed herniation at L4-5 mildly indenting the thecal sac, extending inferiorly to the rest behind the superior-posterior aspect of the L5 vertebra; herniation at L5-S1; and degenerative changes in the lumbar spine, most evident at L4-5 and L5-S1. R. 459.

From September through December 2011, Piersall had physical therapy. R. 413-29. He stopped physical therapy because he did not have insurance. R. 420.

On November 15, 2011, January 11, 2012, and February 13, 2012, Piersall had left L4-5 transforaminal epidural steroid injections. R. 448-49, 452, 455. After the last injection, Piersall reported that his pain dropped from a 6/10 to a 2/10. R. 449.

On March 20, 2012, Piersall had a CT scan of his lumbar spine without contrast. The scan showed central herniation and posterior spondylosis at L4-5, similar to the imaging performed on October 18, 2011. R. 446.

On April 5, 2012, Dr. Robert Kraus, M.D., performed a left L4-5 laminoforaminotomy for decompression and removal of spondylitic ridge. R. 545-46.

On June 27, 2012, Piersall saw Dr. Kraus for a post-operative check. Piersall reported that he was no better after the surgery. He reported ongoing low back pain. Piersall did not have any numbness, weakness, or pain in his legs. Piersall reported that he had to take Norco daily for the pain. R. 504. On examination, Piersall moved comfortably. He had full strength in his lower limbs. Straight leg testing was negative. He had no pain upon range of motion of the hip joints. Dr. Kraus assessed chronic low back pain, degenerative disc disease L4-5, L5-S1, tobacco use, obesity, and status post left L4-5 decompression surgery. Dr. Kraus

recommended that Piersall lose weight and stop smoking. Dr. Kraus opined that he could not provide a surgical solution to Piersall's back pain. R. 504.

On August 2, 2012, Piersall saw pain specialist Dr. Atiq UR Rehman, M.D. R. 478-82. Piersall reported that he had pain in his left lower back that went down into his left hip. He also reported pain in his neck. Piersall indicated that he had injections in his lumbar spine. He reported one to two days of pain relief from the injections. Piersall said the pain was 7 out of 10 at the appointment. The pain was worse with physical activity and better with medication. On examination, Piersall weighed 268.8 pounds. Piersall had 5/5 strength in his hips and knees. Straight leg testing was positive bilaterally. Patrick test was positive on the right and negative on the left. Dr. Rehman assessed low back pain, left SI joint dysfunction, degenerative disc disease, post the April 5, 2012 back surgery. Dr. Rehman ordered an MRI of his lumbar spine. R. 479-81.

On September 18, 2013, Piersall's non-attorney representative Tama Weltzin, completed a Function Report—Adult form for Piersall. R. 280-91. Weltzin stated that Piersall lived in a house with his children and his fiancé. R. 282, 287.

Weltzin said that, typically, Piersall got up at 5:00 or 6:00 am, showered and dressed, woke up his children, ate breakfast and fed his children, took his children to school, ran errands, watched television, ate lunch, napped, did laundry, picked up his children after school, helped them with homework, ate dinner with his family, gave his children baths, watched television, and went to bed about 9:00 p.m.  R. 282.

Weltzin said that Piersall had difficulty falling asleep and staying asleep because of his pain.  Weltzin said Piersall had difficulty dressing himself and bathing himself because of his pain.  Weltzin said Piersall had difficulty holding objects such as razors, silverware, and glasses.  He also had problems cutting food because of his hands.  R. 283-84.

Weltzin said Piersall prepared meals daily, did laundry daily, and mowed his yard weekly.  Piersall drove.  Weltzin said Piersall drove short distances because he could not sit in a car for long periods and he had difficulty holding the steering wheel.  He also had problems turning to check for traffic.  He avoided driving in unfamiliar routes and heavy traffic due to anxiety.  R. 285-86.

Weltzin said Piersall fished one to two times a month, and he built radio-controlled cars once a month.  Piersall also watched television.  Piersall fished where he could sit and did not need to walk long distances.

Piersall had problems performing the fine motor skills needed to build radio-controlled cars.  He sometimes had problems concentrating while watching television.  He also often switched positions or got up while watching television.  R. 283.

Weltzin indicated Piersall's condition limited his ability to lift, squat, bend, stand, complete tasks, and use his hands.  R. 282.  Weltzin said Piersall avoided "lifting more than 10 pounds due to pain, numbness, tingling, muscle spasms, weakness, and fatigue."  R. 288.  Weltzin reported Piersall had difficulty standing for long periods.  Weltzin said  Piersall could walk slowly for 10 to 15 minutes, but then needed to rest 20 to 30 minutes.  Piersall climbed stairs slowly and held onto the railings.  He took longer to complete tasks because he took frequent rest breaks.  He had difficulty using his hands for fine motor skills, gripping, and grasping "due to numbness, tingling, weakness, and fatigue."  He had difficulty concentrating because of his pain.  He also had problems remembering instructions.  R. 288-89.  Weltzin said Piersall had no difficulty getting along with others, including supervisors, and he could handle stress.  Weltzin said Piersall experienced increased anxiety when he had changes in routine.  R. 289.

On November 19, 2013, Piersall saw state agency physician Dr. Hima Atluri, M.D., for a consultative examination.  R. 537-41.  Piersall said

he had constant back pain.  Piersall said that he could not stand for more than 15-20 minutes without stretching.  He said that could not sit for more than 30 minutes.  He said that could not walk for more than a block.  He said he could manage his home as long has he went at a slow pace.  He said he could not run and that brisk walking and brisk exercise was very hard.  He reported pain in his back and neck.  He also said he had numbness and tingling in his fingers. R. 537.

On examination, Piersall was 5 feet nine inches tall and weighed 258 pounds.  Dr. Atluri found significant paraspinal spasm in Piersall's neck.  Piersall had limited range of motion in his neck.  Straight leg testing was abnormal in the back of the thighs both standing and lying down.  Piersall had limited range of motion in his lumbar spine.  Piersall had moderate difficulty getting on and off the exam table and performing tandem walking.  Piersall could not heel walk, toe walk, squat, or hop on one leg.  R. 538-40.

Dr. Atluri assessed central obesity, cervical spine problem with paraspinal spasm, lower lumbar pain with abnormal straight leg testing and radiculopathic symptoms.  R. 540.

On January 30, 2013, Piersall had imaging of his lumbar spine with and without contrast. The imaging showed disk desiccation and disk space narrowing at L4-L5, with anterior disk bulging and posterior disk flattening.

The disks at L4-L5 and L5-S1 were herniated.  The L5-S1 herniation was moderately extruded and moderately indenting the thecal sac.  R. 433, 566.

On February 4, 2013, Piersall saw Dr. Rehman for a follow-up on his lower back pain.  R. 475-77.  Piersall reported continued low back pain that radiated into his left leg.  Piersall did not have a primary care physician and did not have any pain medications for the last two weeks.  Dr. Rehman stated, "Patient is wanting to get things started on having his pain treated." R. 475.  Piersall rated his pain at 6 on a scale of 0 to 10.  Piersall reported a back injury from a snowmobile accident.  Dr. Rehman assessed low back pain, left S1 joint dysfunction, degenerative disk disease, and history of April 5, 2012 back surgery.  Dr. Rehman prescribed Neurontin (gabapentin).  R. 476.

On March 14, 2013, Piersall saw Dr. David Gregory, M.D., as a new patient for primary care.  Piersall reported that he lost his job because he was off work too long due to his back problems.  Dr. Gregory stated, "[H]e needs to have a form filled out for Insurance in an effort to try to obtain some form of disability."  R. 484.  Dr. Gregory prescribed Norco and Flexeril (cyclobenzaprine).  Dr. Gregory also recommended that Piersall continue taking Flexeril.  R. 485.

On April 30, 2013, Piersall saw Dr. Kraus for a follow-up after surgery. R. 491, 547. Piersall reported continuing back pain. Piersall reported that he decided not to have injections in his back because he did not have insurance. R. 491. He reported that Neurontin did not give him any improvement. R. 491. On examination, Piersall was 69 inches tall and weighed 262.8 pounds. Piersall rated his pain as a 6. Straight leg testing was negative, and Piersall had no pain upon range of motion in his hips. Dr. Kraus recommended weight loss, quitting smoking, and performing a daily exercise program. Dr. Kraus recommended against further surgery. R. 491, 547.

On December 2, 2013, Piersall saw Dr. Gregory for a follow-up on his back pain. Dr. Gregory stated,

> Mr. Piersall comes in today for follow-up of his low back pain. Things are about the same; evidently the neurosurgeon here in town basically told him there is nothing more that he could do and the patient should have pain. Patients pain and problems or some such that he really cannot work, and he is currently still on disability with his job (so there is an income) however he still does not have any insurance and really can't afford even to get a second opinion on his back until he does have some form of insurance. His children are on "All Kids" but he and his wife evidently bring in too much money to qualify.

R. 543-44. On examination, Piersall was 69 inches tall and weighed 256 pounds. Piersall had no tenderness in his back. He had full range of

motion in his extremities.  Dr. Gregory observed no localized neurological or physiological findings.  R. 543.

On December 11, 2013, state agency physician Dr. Towfig Arjmand, M.D., completed a Physical Residual Functional Capacity Assessment of Piersall.  R. 119-20.  Dr. Arjmand opined that Piersall could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, crouch, and crawl; but had no other physical limitations.  R. 119-20.

Dr. Arjmand noted that Piersall had bilateral carpal tunnel release surgery in 2001 and back surgery in 2012 at the L4-5 level.  Dr. Arjmand reviewed MRIs dated September 5, 2011, October 18, 2011, January 30, 2013, and November 2013.  R. 120.

On February 5, 2014, the Hartford Insurance Company wrote Piersall a letter (Letter).  R. 570.  Piersall's former employer Rathje Enterprises, Inc. d/b/a Bodine Electric of Decatur, provided long term disability benefits coverage to its employees through Hartford Insurance Company.  The Letter stated that Piersall qualified for long term disability benefits on and after March 5, 2014.  R. 570.

On March 28, 2014, Piersall saw Dr. David Gregory, M.D., for a follow-up on his back pain and disk herniation.  Piersall reported that the pain was about the same.  On examination, Piersall's back had no tenderness, but decreased range of motion secondary to pain and stiffness.  Piersall had full range of motion in his extremities.  Dr. Gregory observed no localized neurological or physiological findings.  Dr. Gregory continued Piersall's pain medications and added Celexa (citalopram) for anxiety. R. 542.

On June 5, 2014, state agency physician Dr. Young-Ja Kim, M.D. prepared a Physical Residual Functional Capacity Assessment of Piersall.  R. 130-32.  Dr. Kim's assessment agreed with Dr. Arjmand's December 2013 assessment.  R. 130-31.  Dr. Kim listed the same medical history and examinations mentioned by Dr. Arjmand.  R. 131.

On August 29, 2014, Piersall saw Dr. Gregory.  Piersall reported that he is beginning to experience numbness/pain/tingling in his left leg down to his left foot.  On examination, Piersall had limited range of motion in his lumbar spine secondary to pain.  R. 576.

On February 6, 2015, Piersall saw Dr. Gregory.  Piersall reported that he had no worsening of his back pain or radiculopathy symptoms.  On

examination, Piersall weighed 270 pounds.  Piersall had moderate to severe decreased range of motion in his lumbar spine.  R. 577.

On September 11, 2015, Piersall went to the hospital emergency room with neck and left shoulder pain.  Piersall reported that he hurt his neck at work two years ago.  He said an MRI showed two ruptured discs.  He said the doctors at that time said they could not perform surgery on his neck.  He reported that he had physical therapy and injections in his neck.  He said the shots did not give him any relief.  He did not have a primary care physician.  R. 655.  On examination, Piersall was tender in his neck and lumbar spine.  He had limited range of motion and tenderness.  The emergency room physicians prescribed pain relievers and discharged him.  His condition had improved.  R. 657.

On October 9, 2015, Piersall saw Dr. David Oligschlaeger, D.O. as a new patient.  R. 579-80.  Piersall reported a long history of back issues.  Piersall said he wanted further treatment.  On examination, Piersall's gait and station were normal.  Dr. Oligschlaeger assessed chronic back pain greater than three months duration.  Dr. Oligschlaeger ordered a lower extremity electromyogram (EMG).  R. 580.  On November 4, 2015, Piersall had an EMG/nerve conduction study of his lower extremities.  The test results were normal.  R. 581-82.

On January 13, 2016, Piersall was given an MRI of his lumbar and cervical spine. R. 565-68. The MRI of the lumbar spine showed herniated discs at L4-5 and L5-S1, with greater degenerative changes at L4-5 than at L5-S1. R. 565. The MRI of the cervical spine showed a herniated, bulging disc at C6-C7 mildly impinging on the spinal cord at C6-C7. The bulging at C6-C7 and C5-C6 was greater than at other cervical levels. There was also foraminal encroachment at C3-C4 with uncovertebral joint hypertrophy, disk bulge, and broad-based herniation. R. 567-68.

On February 15, 2016, Piersall saw Dr. Oligschlaeger. R. 609-11. Piersall complained of continuing back pain and boils. Piersall reported that the Cymbalta did not improve his pain. He stopped taking it because it caused bowel issues. On examination, Piersall's gait and station were normal. R. 610. Dr. Oligschlaeger prescribed Sertraline HCL instead of Cymbalta. Dr. Oligschlaeger also stated he would fill out papers from the Social Security Administration. R. 611.

On March 10, 2016, Piersall started physical therapy. R. 635-37. Piersall reported stiffness in his neck and lumbar spine. He rated his pain as 6/10. He reported problems sleeping. The physical therapist assessed decreased range of motion, decreased strength, and decreased activity tolerance. R. 637. Piersall attended physical therapy sessions on March

16, 2016, March 18, 2016, March 24, 2016, March 29, 2016, March 31, 2016, April 5, 2016, and April 7, 2016. R. 638-47. Piersall showed some improvement. On April 7, 2016, Piersall reported that his pain was not as sharp and not constant. R. 646. He still had decreased range of motion, decreased strength, and decreased activity tolerance. R. 646. The therapist stated that Piersall would benefit from skilled rehabilitation. The therapist stated that therapy would be discontinued, and that Piersall wanted to return to his doctor "to see what he plans to do next." R. 647.

On April 19, 2016, Piersall saw nurse practitioner Kathryn A. Naron, CNP, in Dr. Rehman's office. R. 647-51. Piersall reported constant pain in his lower back and buttocks, mostly on the left. He reported that he used a TENS unit with little relief. He received little relief from injections. Piersall reported that he had difficulty moving his head up and down. R. 647. On examination, Naron observed paraspinal tender points but no spinal tender points. Naron observed sub-scapular tenderness bilaterally. R. 649-50. Naron assessed low back pain, left SI joint dysfunction, degenerative disc disease, history of surgery at L4-5, neck pain, multi cervical disc bulges and cervical spondylosis. R. 650. Naron recommended injections in the cervical spine. Dr. Rehman met with Piersall during the office visit. R. 651.

On April 28, 2016 and May 12, 2016, Dr. Rehman administered interlaminar cervical epidural steroid injections into Piersall's cervical spine. R. 651-53.

On May 11, 2016, Dr. David Oligschlaeger completed an "Absenteeism as it Relates to Employment" form and a "Social Security Administration Listing of Impairments" form. R. 613-14. The Social Security regulations list medical conditions that are so severe that an unemployed person is disabled regardless of the person's age, education, or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404 Subpart P, Appendix 1. The listed impairments are referred to individually as a "Listing," and collectively as the "Listings." Dr. Oligschlaeger opined that Piersall had evidence of root compression and positive straight leg testing, but his condition did not meet the Listing for disorders of the spine. R. 614. Dr. Oligschlaeger also opined that, if employed, Piersall would miss work two or more days per month due to his back and neck problems. R. 613.

## THE EVIDENTIARY HEARING

On May 18, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 60-113. Piersall appeared in person and with his attorney. Vocational expert Chrisann Schiro-Geist appeared by telephone.

R. 62.  Piersall's attorney objected to the September 18, 2013 Function Report-Adult prepared by Weltzin.  Piersall's attorney said that the form was prepared by a non-attorney representative for his long-term disability insurance.  Piersall's attorney said that the form listed activities that Piersall did not perform.  The ALJ admitted the form and said she would ask Piersall for more details regarding the errors on the form. R. 63.

Piersall then testified.  Piersall testified that he had cervical pain since 2001.  Piersall indicated that he injured his neck at work when he was wedged under a pipe.  Piersall said that the pain radiated from his neck into his arms.  Piersall testified that he had loss of sensation in his arms on a daily basis.  He said turning his neck caused pain.  Piersall said he had muscle spasms in his shoulders, ribs, middle of his back.  R. 69.  Piersall related that he tried physical therapy twice on his neck.  R. 69-70.  Piersall testified that the pain radiating into his arms had affected his hands.  He said he had trouble gripping small objects such as plates and silverware. R. 78.  He told Dr. Oligschlaeger about problems with his grip.  He also told Dr. Kraus the last time he saw him.  Piersall said that he had an MRI scheduled the day after the hearing to test for multiple sclerosis.  R. 99-100.

Piersall said he had pain in his lower back. The pain traveled into his hips, thighs, and buttocks. Piersall described the pain as an electrical shock and pressure. Piersall said that sometimes the neck pain was worse and sometimes the back pain was worse. R. 70. Piersall indicated that sitting for long periods aggravated the pain in his back. He said sitting caused pain in his legs. R. 70. His back was really tense and his leg was throbbing due to sitting and waiting for the hearing. R. 71.

Piersall testified that he had to move frequently when he watched a 30-minute television program. He said he moved from a chair to a couch, or he stood up. R. 71. Piersall noted that bending and squatting increased his back pain. R. 78-79. Piersall said he avoided standing because his legs felt fatigued, warm, and tired if he stood. He said walking made the pain worse. R. 79.

Piersall previously enjoyed fishing and racing radio controlled cars, but he could do neither activity now. He said he could not race cars because of "the pain and discomfort from being on my feet and out at the facilities." R. 72.

Piersall testified that his eldest son did the yardwork. He said he could walk 40 feet to his mailbox and back. R. 72-73. Piersall said that he did not give his children baths, and he did not do laundry. He noted that he

did not sweep, mop, clean counters, or straighten up the house.  R. 74.
Piersall said reaching forward put pressure on his tailbone.  R. 75.

Piersall said, when he had severe back pain, he used his TENS unit and curled up in a fetal position.  Piersall stated the TENS unit provided a little relief while it was running.  R. 75.  Piersall said he was most comfortable "Laying on my bed.  In a fetal position with a pillow tucked under my neck."  R. 79.

Piersall received cervical injections shortly before the hearing.  The injections only worked for a day.  Piersall said physical therapy stretches aggravated his back and neck condition.  R. 76.

Piersall testified that he drove a little. He took his children to and from school.  He said the school was two blocks from his house.  R. 76-77.

Piersall usually wore slip-shoes.  He said his wife tied the laces on the shoes he wore to the hearing.  His wife put his socks on for him and sometimes put his underwear on him.  R. 77.

Piersall testified that he tried to lie in a fetal position to go to sleep. He said he wore a mask from a CPAP machine now.[1]  He could not lie in a fetal position anymore because the mask came off in that position.  R. 79-80.

---

[1] CPAP means continuous positive airway pressure.

Piersall noted that his pain has steadily gotten worse since his surgery in 2012. He said he had more leg pain before the surgery. Since the surgery, he had "continuous back pain that I didn't have before." He described the pain in his neck as a "constant burn in between my shoulder blades that just, it just doesn't seem to go away." R. 81.

Piersall said he stopped working because he could not take the pain anymore. He went to the emergency room because he was having spasms on his left side. He thought he was having a heart attack. He went to a second emergency room that took an MRI. R. 91.

Piersall said he did not look for other work because, "I don't feel I could, I could do a whole lot." R. 97. Piersall testified that he was receiving short term and long-term disability benefits. He said that the benefits did not affect his decision not to look for work. He said he would have looked for work if he thought that he could work. R. 101.

Piersall testified that he lived with his wife and three children ages 8, 9, and 14. They lived in a one-story house. In the previous year he went to two of his eldest son's basketball games and two of his youngest son's games. His youngest son played basketball and soccer. R. 98-99. He said his eldest son had 30 games and his youngest son had 210 games, but he only went to two games of each child because he could not go up

and down stairs or sit in bleachers.  He said when he went, he alternated between standing against a wall and sitting in a chair during the games.  R. 101-02.

Vocational expert Schiro-Geist then testified.  The ALJ asked Schiro-Geist about a hypothetical person with Piersall's age, education, and work experience, who was limited as follows:

> Assume that he is limited to lifting and carrying occasionally 20 pounds and frequently 10. That he can sit at least six hours in an eight hour day. Walk six hours in an eight hour day.  That he can stand and/or push and pull the same.  Only occasional climbing of ladders or ropes. Only occasional stooping, crouching and crawling.

R. 107-08.  Schiro-Geist opined that such a person could not perform Piersall's past relevant work as he performed it.  Schiro-Geist opined that such a person could perform retail sales as the job as it is generally performed.  R. 108.  Schiro-Geist opined that such a person could perform other jobs, including light assembly, with 800,004 such jobs in the national economy; light inspection, with 735,000 such jobs in the national economy; and light assembly.  Schiro-Geist did not opine on the number of light assembly jobs. R. 108-09.

The ALJ asked Schiro-Geist to consider the same person except the person "will need to be able to shift positions in his seat as needed when he's sitting, and he would need to change positions from sitting to standing

or standing to sitting about every 45 minutes to an hour, if necessary." R. 109. Schiro-Geist opined that such a requirement would reduce the number of jobs in the national economy for assembly jobs from 800,004 to 219,500; for inspection jobs from 735,000 to 175,000; and for packing jobs reduced to 50,200. R. 109-10.

Schiro-Geist gave her opinion that a person could not be employed if he needed to be absent during the first 90 days of work, and thereafter absent more than two days per month. She also opined that a person could not be employed if: he regularly required excess breaks; he was off-task more than 10 to 15 percent of the time at work; or if he had to lie down at work (beyond lying down during any break period).

The ALJ concluded the hearing. The ALJ left the record open for 30 days to allow Piersall to submit additional evidence. R. 112-13.

## THE OPINION OF THE ALJ

The ALJ issued her opinion on August 3, 2016. R. 11-21. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true,

Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in the Listings in 20 C.F.R. Part 404 Subpart P, Appendix 1; 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Piersall met his burden at Steps 1 and 2 of the Analysis. The ALJ found that Piersall had not engaged in substantial gainful activity since September 1, 2011, and he suffered from severe impairments due to spinal disorders. R. 13. At Step 3, the ALJ found that Piersall's impairments or combination of impairments did not meet or medically equal a Listing.

At Step 4, the ALJ found that Piersall had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). He can lift/carry 20 pounds occasionally and 10 pounds frequently. He can sit for 6 hours in an 8-hour workday. He can stand/walk 6 hours. He can push/pull as much as he can lift/carry. He can occasionally climb ladders or ropes, stoop, crouch, or crawl. He would need to shift positions in his seat as needed and need to change from sitting to standing or from standing to sitting at his workstation as necessary every 45 minutes to an hour.

R. 16. The ALJ based her finding on the opinions of Drs. Arjmand and Kim. The ALJ relied on five examinations in Piersall's medical records,

> On June 27, 2012, it was noted that he moved comfortably. On examination, he had full strength to his lower limbs and negative straight leg raise bilaterally. During physical examinations in December 2013 and March 2014, there were no neurological deficits. He displayed normal gait and station in October 2015 and February 2016. Also, an electromyography

(EMG) of the lower extremities, on November 4, 2015, was
normal.

R. 18 (internal citations to the record omitted). The ALJ cited notes form these five examinations as support for her conclusion that, "After surgery, there was a host of normal physical findings with no abnormal evidence to preclude him from performing light work." R. 19

The ALJ relied on Dr. Kraus' opinion that further surgery would not improve Piersall's condition. The ALJ found that the "normal clinical findings do not indicate a need for further surgery." (R. 19) (citing the five examination notes quoted immediately above).

The ALJ also found that Piersall did not comply with prescribed treatment, "The claimant is non-compliant with treatment. In February 2013, he reported not taking medications for two weeks. In April 2013, he denied injections because he did not have insurance." R. 18 (internal citations to the record omitted).

The ALJ found that Piersall's testimony about his daily activities were outweighed by the medical evidence because the testimony "could not be objectively verified with any reasonable degree of certainty," and because, "[E]ven if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak

medical evidence and other factors discussed in this decision."  R. 18.  The ALJ also found that Piersall "appears to be a very active individual . . . . For example, at the hearing, he testified that he drives his children to school and goes to his children's sporting events at school."  R. 18-19.

The ALJ gave little weight to Dr. Oligschlaeger's opinion that Piersall would miss two to three days of work per month.  The ALJ said that Dr. Oligschlaeger did not give a reason for his opinion.  The ALJ also noted that Piersall complained of chronic pain for 10 years, but continued to work. The ALJ also noted that Piersall's daily activities "are good" and that Piersall went several months without pain medication.  R. 19.  The ALJ also stated that statements that a person is disabled encroached on the legal issues reserved to the Commissioner.  R. 19.

The ALJ found at Step 4 that Piersall could not return to his past relevant work.  The ALJ relied on the RFC determination and the opinions of Schiro-Geist.  At Step 5, the ALJ found that Piersall could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of Schiro-Geist that person with Piersall's age, education, work experience, and RFC could perform the light assembly, light

inspector, and packer jobs.  R. 20.  The ALJ concluded that Piersall was not disabled.

Piersall appealed the ALJ's decision.  The Appeals Council denied his request for review on July 10, 2017.  Piersall then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of <u>all</u> relevant evidence. (emphasis added)  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ did not articulate minimally her analysis of all the relevant evidence and, as a result, did not build an accurate and logical bridge from the evidence to her conclusion.  The ALJ found that the medical evidence was weak and showed mild limitations.  The ALJ drew this conclusion from six statements in five examinations on June 27, 2012, March 2013, December 2014, and October 2015, and February 2016.  R. 18.  The ALJ further said that, "After surgery, there was a host of normal physical findings with no abnormal evidence to preclude him from performing light work."  The ALJ failed to explain how abnormal evidence in medical records after the April 2012 surgery was consistent with her analysis.

After April 2012, the medical records included:  two imaging studies that showed multiple ruptured and herniated disks (R. 433, 565-68); two examinations that showed positive or abnormal straight leg tests (R. 479-81, 538-40); seven examinations that showed limited range of motion in the

cervical and/or lumbar spine (R. 538-40, 542, 576, 577, 637, 646, 657); three examinations that showed tenderness in the cervical and/or lumbar spine (R. 657, 649-50, 657); and one examination that showed paraspinal spasms (R. 538-40). This list of abnormal findings after April 2012 is not meant to be exhaustive. The ALJ did not mention any of these abnormal findings in her RFC determination, let alone explain how these findings were consistent with her statement that the medical records contained "no abnormal evidence to preclude him from performing light work." In this case, the Court must conclude that the ALJ improperly failed "to minimally articulate" her analysis of the material evidence. Herron, 19 F.3d at 333 (7th Cir. 1994); see Bates v. Colvin, 736 F.3d 1093, 1099 (7th Cir. 2013) (ALJ must not "cherry-pick" only the favorable evidence in the record while ignoring a line of other material contrary evidence.).

The ALJ also did not adequately explain her finding that Piersall was non-compliant with his treatment. To support this finding, the ALJ cited one time when Piersall was out of pain medication for two weeks and one time that he denied injections in his spine because he did not have insurance to cover the cost. R. 18. The ALJ failed to explain how two incidents in a five-year long medical record supported the conclusion that Piersall was

non-compliant with treatment.  The ALJ also did not explain how being unable to pay for spinal injections constituted non-compliance.

The ALJ also did not adequately explain her finding that Piersall was a "very active individual."  R. 18-19.  The only activities she cited to support this finding were driving two blocks, twice a day, to take his children to and from school, and attending four of his two sons' many, many sporting events.  The Court does not understand how these activities made Piersall "very active."

Finally, the ALJ made the unusual statement that Piersall's testimony about his limitations due to pain was not entitled to probative weight because his testimony "could not be objectively verified with any reasonable degree of certainty."  R. 18.  The ALJ should certainly consider the testimony in light of all the other evidence.  <u>See generally</u> SSR 16-3p. The Court, however, is not aware of any precedent or direction from the Commissioner that a claimant's testimony must be "objectively verified" to "a reasonable degree of certainty" before it will be considered.  Indeed, the Seventh Circuit has stated repeatedly that the ALJ cannot discount testimony about limitations due to pain just because the pain could not be shown by objective medical evidence.  <u>See</u> <u>Adaire v. Colvin</u>, 778 F.3d 685, 687 (7th Cir. 2015) and cases cited therein.  The ALJ must explain why

Piersall must present such "objective" verification before his testimony should be entitled to any consideration.

In light of the ALJ's failure "to minimally articulate" her analysis of the material evidence and her unsupported requirement for objective verification of claimant testimony, the Court must reverse and remand this case for further proceedings.

THEREFORE, IT IS ORDERED that Plaintiff Bradley Piersall's Motion for Summary Judgment (d/e 13) is ALLOWED; Defendant Commissioner's Motion for Summary Affirmance (d/e 18) is DENIED; and the decision of the Commissioner is REVERSED and REMANDED for further proceedings before the Social Security Administration.

ENTER:  August 14, 2018

_s/ Tom Schanzle-Haskins_
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE